UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Jean Kidd,                                              Civil No. 10-4112 (SRN/SER)

          Plaintiff,

    v.                                                  **MEMORANDUM OPINION
                                                         AND ORDER**

Alex Jackson, and the City of
Minneapolis,

          Defendants.

---

Andrew P. Muller, Muller & Muller, PLLC, 3109 West 50th Street, Suite 362, Minneapolis, MN 55410; and John A. Klassen, John A. Klassen, PA, 10 South Fifth Street, Suite 700, Minneapolis, MN 55402, for Plaintiff.

Joel M. Fussy and Timothy S. Skarda, Minneapolis City Attorney's Office, 350 South Fifth Street, Room 210, Minneapolis, MN 55415, for Defendants.

---

SUSAN RICHARD NELSON, United States District Judge

    This matter is before the Court on Defendants' Motion for Summary Judgment [Doc. No. 21]. For the reasons stated below, the Motion is granted in part and denied in part.

**I.    FACTUAL AND PROCEDURAL BACKGROUND**

    Jean Kidd began working as a firefighter for the City of Minneapolis in 1986. In 1992, she was promoted to Captain. In 2007, Defendant Alex Jackson, then an Assistant Chief, chose Kidd to be the Fire Department's Deputy Chief of Personnel. (Muller Decl. Ex. 3 [Doc. No. 32-3] at 23-24 (Kidd Dep.).) Later that same year, Jackson became the

Chief of the Minneapolis Fire Department,[1] and retained Kidd as Deputy Chief. Kidd's position was an appointed one, and she served at the pleasure of the Chief.

During her tenure as Deputy Chief of Personnel, Kidd received good performance reviews. Part of her job was writing, and she often wrote for Chief Jackson. (Id. at 22.) Thus, according to Kidd, Jackson knew her writing style well. (Kidd Decl. [Doc. No. 33] ¶ 9.)

In June 2009, Kidd was asked to participate in what is known as a 360-degree survey regarding Chief Jackson's leadership of the Department. Participants included all staff who reported directly to Chief Jackson, other department heads in the City of Minneapolis, and some members of the public. (Skarda Aff. Ex. 15 [Doc. No. 26-15] at 1 (DRI Consulting's subpoena responses).) Participation was voluntary. Kidd debated whether to participate in the survey, and ultimately decided to participate because she believed that she offered a unique perspective on Jackson's leadership as not only an employee of the Department, but also a resident of Minneapolis. (Kidd Dep. at 30.) Immediately after filling out the survey, she called the consultant performing the survey to express concern that her responses might subject her to retaliation. (Id. at 29-30.) The consultant assured her that her responses would be anonymous, but that the narrative responses would be provided to Chief Jackson verbatim. Kidd responded that Chief Jackson would be able to identify her comments based on his familiarity with her writing

---

[1] Jackson retired from his position as Chief of the Department in early 2012. Steve Brandt & Eric Roper, Embattled Minneapolis Fire Chief to Retire, Minneapolis Star Tribune, Jan. 5, 2012, www.startribune.com/local/minneapolis/136709808.html?refer=y.

style, and that she could lose her job. (Id. at 30.) She decided, however, to include her comments in the survey because she thought it was important for Chief Jackson to know her opinions. (Id. at 30-31.)

Kidd's comments in the survey were somewhat critical of Chief Jackson and his leadership of the Department. She noted, for example, that the Chief lacked a strategic plan or vision for the Department, and that he viewed people with different viewpoints as disrespectful. (Skarda Aff. Ex. 4 [Doc. No. 26-4] at 13, 14 (June 2009 360-Degree Feedback Survey Report for Alex Jackson).) Although her comments were not attributed to her in the final survey results that were presented to Chief Jackson, her comments were the only negative comments in the survey results.

On June 18, 2009, Kidd received a performance review. (Muller Decl. Ex. 1 [Doc. No. 32-1].) Her direct supervisor, Assistant Chief of Administration Cherie Penn, was responsible for the contents of the review, but Chief Jackson also signed the review. Kidd was judged to have met or exceeded expectations in every job category in the review. The review contained a few negative comments, including a notation that Kidd "ha[d] a tendency to stray into other's areas of responsibility which she is encouraged to work on." (Id. at 7.) Nearly all of the comments in Kidd's review, however, were very positive.

Chief Jackson received the results of the 360-degree survey, including Kidd's anonymous comments, in late June 2009. (Skarda Aff. Ex. 2 [Doc. No. 32-2] at 72 (Jackson Dep.).) On June 30, Chief Jackson informed Kidd that he was removing her

3

from the position of Deputy Chief.  He did not offer a reason for the "unappointment," but at a staff meeting the next day he told the remaining staff that he did not want people surrounding him who were unable to work together or who were unhappy.  (Skarda Aff. Ex. 9 [Doc. No. 26-9] (July 1, 2009, TMT[2] meeting minutes).)  Kidd was escorted from the building on June 30; she contends that the unappointment occurred in the middle of the day and that it was humiliating to be escorted out of the building in front of her co-workers.  (Kidd Decl. ¶ 10.)  Her unappointment meant that she assumed her previous Captain position, resulting in a substantial reduction in pay and other benefits.  (See id. ¶ 11 (claiming "about $20,000" in lost pay annually as a result of the demotion, in addition to lost pension contributions).)

Kidd brought this lawsuit, raising four claims against Chief Jackson and the City of Minneapolis.  In her response to this Motion, however, she stated that she is now pursuing only her claim that Defendants violated 42 U.S.C. § 1983 by retaliating against her for exercising her First Amendment rights.  (Pl.'s Opp'n Mem. [Doc. No. 31] at 11 & n.4.)  She does not oppose dismissal of her remaining claims, and thus Defendants' Motion with respect to Counts Two, Three, and Four of the Complaint is granted and those claims will be dismissed with prejudice.

---

[2] TMT stands for top management team, and includes the Chief, assistant chiefs, and deputy chiefs and captains who work in the Department's administrative office.  (Muller Decl. Ex. 2 [Doc. No. 32-2] at 39 (Jackson Dep.).)  Chief Jackson held TMT meetings once a month.  (Id.)

## II. DISCUSSION

### A. Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. Enter. Bank v. Magna Bank, 92 F.3d 743, 747 (8th Cir. 1996). However, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Id. at 323; Enter. Bank, 92 F.3d at 747. A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). On a Motion for Summary Judgment, the Court views the facts in the light most favorable to the nonmoving party, here Plaintiff Jean Kidd. Davison v. City of Minneapolis, 490 F.3d 648, 651 (8th Cir. 2007).

### B. Prima Facie Case

#### 1. Protected Activity

To establish a prima facie case of retaliation based on the exercise of First

5

Amendment speech rights, a public employee must establish: first, that she engaged in protected activity; second, that the defendant or defendants took an adverse employment action against her; and third, that the protected conduct was a substantial or motivating factor in the decision to take the adverse employment action. Davison v. City of Minneapolis, 490 F.3d 648, 654-55 (8th Cir. 2007).

The first element of the prima facie case is whether the speech at issue was made by the speaker "as a citizen upon matters of public concern" and is therefore protected under the First Amendment. Garcetti v. Ceballos, 547 U.S. 410, 415-16 (2006) (quoting Connick v. Myers, 461 U.S. 138, 143-44 (1983)). Whether the public employee's speech constitutes protected activity is a question of law for the Court to determine. McGee v. Pub. Water Supply Dist. #2 of Jefferson Cnty., 471 F.3d 918, 920 (8th Cir. 2006); Connick, 461 U.S. at 148 n.7.

To determine whether the speech at issue is protected, the Court engages in a two-step analysis. McCullough v. Univ. of Ark. for Med. Sciences, 559 F.3d 855, 865 (8th Cir. 2009) (citing Pickering v. Board of Education, 391 U.S. 563, 568 (1968)). "The first question is whether [the] speech can be 'fairly characterized as constituting speech on a matter of public concern.'" McCullough, 559 F.3d at 866 (quoting Connick, 462 U.S. at 146). If the answer to that question is no, then the speech is not entitled to First Amendment protection. Id. If, however, the answer is yes, "then [Kidd's] 'right to comment on matters of public concern must next be balanced with the [employer's] interest in promoting the efficiency of the public services it performs through its

6

employees.'" Id. (quoting Sparr v. Ward, 306 F.3d 589, 594 (8th Cir. 2002).)

In Garcetti, the Supreme Court determined that a state prosecutor's comments on the veracity of a search-warrant affidavit did not constitute protected speech, because the speech was "made pursuant to [the prosecutor's] duty as a [supervising attorney]" and was therefore not speech on a matter of public concern. 547 U.S. at 421. The Court cited at length the opinion of Judge Diarmuid F. O'Scannlain, concurring in part and dissenting in part in the appellate court's decision under review. As Judge O'Scannlain noted, there is a distinction "'between speech offered by a public employee acting as an employee carrying out his or her ordinary job duties and that spoken by an employee acting as a citizen expressing his or her personal views on disputed matters of public import.'" Id. at 416 (quoting Ceballos v. Garcetti, 361 F.3d 1168, 1187 (9th Cir. 2004) (O'Scannlain, J., specially concurring) (emphasis in original)). This is so because "'when public employees speak in the course of carrying out their routine, required employment obligations, they have no personal interest in the content of that speech that gives rise to a First Amendment right.'" Id. at 416-17 (quoting Ceballos, 361 F.3d at 1189 (O'Scannlain, J., specially concurring)).

In other words, "[i]f the main motivation for the speech was furthering [the employee's] 'private interests rather than to raise issues of public concern, her speech is not protected, even if the public would have an interest in the topic of the speech.'" Altonen v. City of Minneapolis, 487 F.3d 554, 559 (8th Cir. 2007) (quoting Bailey v. Dep't of Elem. & Secondary Educ., 451 F.3d 514, 518 (8th Cir. 2006)). To determine the

primary motivation for the speech, the Court examines the content, form, and context of the speech. Id.

There are certain types of speech that almost by definition constitute protected activity. These include a teacher's letter in a newspaper criticizing funding policies of the school board, Pickering, 391 U.S. at 566; a police officer's support of a candidate for Chief of Police, Altonen, 487 U.S. at 560; or a firefighter's public criticism of a plan to close several ladder companies and lay off firefighters, Davison, 490 F.3d at 655. Although the public employees in these cases no doubt had some personal interest in the content of their speech, the primary motivation for the speech was public, or "as a concerned citizen attempting to inform the public about her government employer's practices." Altonen, 487 F.3d at 560.

On the other hand, there are many cases in which the employee's speech is clearly personally motivated. For example, in Altonen, the police officer plaintiff also filed a lawsuit to gain access to an investigative file regarding a charge of violating a police department policy. 487 F.3d at 557. However, the lawsuit was not intended to reveal anything about the department's practices. Cf. id. Rather, the police officer was primarily motivated by "her personal interest in obtaining access to her files." Id. at 559-60. Thus, the filing of the lawsuit was not protected speech. Similarly, an employee who filed claims of harassment against two co-workers who had first accused him of sexual harassment was not entitled to First Amendment protection, because his "primary interest was to remain employed," not to inform the public about any problem or issue at his

public employer.  McCullough, 559 F.3d at 866.

Kidd's criticisms of Chief Jackson in the 360-degree survey are similar to the kind of speech to which courts traditionally give First Amendment protection.  There is no argument that she had any private interest whatsoever in her honest assessment of the Chief's performance, and indeed the evidence shows that she was concerned that her answers were contrary to her personal interest.  (Kidd Dep. at 29-31.)  Moreover, the City sought Kidd's answers to the questions in the 360-degree survey to "help department heads monitor and manage their performance – where they are strong and where they need to improve."  (Skarda Aff. Ex. 15 [Doc. No. 26-15] at 4 (blank copy of 360-degree survey for Minneapolis department heads).)  This is unquestionably a matter of public interest, as that interest includes using taxpayer funds efficiently, by encouraging public employees to perform effectively.  And as Defendants agree, Kidd's participation in the survey was not part of her job duties.  (Jackson Dep. at 80-81.)

When balancing Kidd's right to speak with the Fire Department's "interest in promoting the efficiency of the public services it performs through its employees," McCullough, 559 F.3d at 866, it is clear that Kidd's right to honestly evaluate her boss when asked to do so is paramount.  Kidd's participation in the survey was voluntary, not a part of her job duties. When Defendants sought her participation in the survey, they asked her to give honest responses to the questions in order to help evaluate Chief Jackson's job performance to increase the efficiency of the Department.  The Supreme Court noted in Pickering that "the interest of the [Department] in limiting [its employees']

opportunities to contribute to public debate is not significantly greater than its interest in limiting a similar contribution by any member of the general public." 391 U.S. at 573.  In the context of this case, the Department's interest lies not with limiting its employees' contributions to performance evaluations but in encouraging those contributions, because an employee's honest assessment of his or her boss is even more valuable than a member of the public's assessment of that same individual.  On balance, then, Kidd's right to speak outweighs any interest the Department may have had in limiting her speech.

      Defendants make much of the fact that Kidd's responses to the survey were not public and that she was only asked to participate in the survey because of her job.  However, some members of the public were asked to participate in the survey, in addition to other City department heads and those reporting directly to Chief Jackson.  (Skarda Aff. Ex. 15 [Doc. No. 26-15] at 1 (DRI Consulting's subpoena responses).)  Defendants' actions in soliciting public participation suggests that the survey was a matter of public concern.  Moreover, it is not dispositive that the speech was made inside the office, rather than publicly, or that the speech concerned the subject matter of the employee's employment.  Garcetti, 547 U.S. at 420-21.  Speech made privately relating to the employee's job can be protected speech under the First Amendment.  The key inquiry is the employee's motivation in speaking.  Here, the undisputed evidence is that Kidd's only motivation was a public one.  Participation in the survey was completely voluntary, and she participated because she wanted to help Chief Jackson improve his job performance.  Her motivation was not personal.  The inescapable conclusion is that Kidd's comments on

the 360-degree survey are protected as speech on a matter of public concern under the First Amendment.

### 2. Adverse Employment Action

Defendants do not strongly dispute that Kidd's demotion to the rank of Captain was an adverse employment action. Kidd has succeeded in meeting this element of her prima facie case.

### 3. Substantial or Motivating Factor

Finally, Kidd has raised a genuine issue of material fact as to whether her survey comments were a substantial or motivating factor in Chief Jackson's decision to unappoint her from the Deputy Chief position. There is no dispute that Chief Jackson knew that Kidd's comments were included in the 360-degree survey (Jackson Dep. at 73-74), nor is there a dispute that he received those comments shortly before he decided to unappoint her. While temporal proximity, standing alone, cannot in the usual case suffice to establish this element,[3] "temporal proximity . . . can contribute to establishing the third element of a prima facie case of retaliation." Davison, 490 F.3d at 657. Chief Jackson made his decision to unappoint Kidd despite agreeing on her June 2009 performance appraisal that she met or exceeded every expectation the Department had for her. See Hudson v. Norris, 227 F.3d 1047, 1051 (8th Cir. 2000) (holding that a retaliation

---

[3] The gap between Kidd's protected conduct and her demotion is so short that it might suffice to establish causation. See, e.g., Hudson v. Norris, 227 F.3d 1047, 1051 (8th Cir. 2000) (noting that retaliation occurred "hard on the heels" of protected conduct when it happened four months after the conduct).

11

plaintiff's "very good" employment record combined with the fact that the adverse employment actions happened within four months of his protected conduct was sufficient to allow a reasonable jury to infer a causal link between the two). Moreover, Chief Jackson's comments at the TMT meeting the day after Kidd's unappointment, viewed in the light most favorable to her, could lead a reasonable jury to conclude that he demoted Kidd because of her comments on the survey. Certainly, there is no other evidence in the record that Kidd was an "unhappy" employee or that she was not otherwise a team player. (Skarda Aff. Ex. 9.)

Viewing all of the facts in this case in the light most favorable to Kidd, a reasonable jury could conclude that Kidd's comments on the survey were a substantial or motivating factor in Chief Jackson's decision to demote her. For the purposes of this Motion, she has established the elements of a prima facie case of retaliation.

**C.    Defendants' Burden**

Because Kidd has established a prima facie case of retaliation for the exercise of her First Amendment rights, the burden shifts to Defendants to "demonstrate that the same employment action would have been taken even in the absence of the protected activit[y]." Davison, 490 F.3d at 658. Defendants have proffered evidence that Chief Jackson might have decided to unappoint Kidd regardless of her survey comments, such as Chief Jackson's assertion that he was merely putting in place his own team. (Jackson Aff. [Doc. No. 27] ¶¶ 4-5.) Kidd has proffered evidence that calls into doubt the Defendants' explanation, namely the fact that Chief Jackson chose Kidd for the Deputy

Chief position before he became Chief. (Kidd. Dep. at 23-24.) It is inappropriate at this stage for the Court to independently weigh this conflicting evidence. See Davison, 490 F.3d at 659 (noting that genuine issues of material fact remained for resolution on defendant's burden). A jury must determine whether Defendants have met their burden to show that Chief Jackson would have taken the same action against Kidd even in the absence of her comments on the 360-degree survey.

Kidd has raised genuine issues of material fact on her retaliation claim against Chief Jackson.[4]

**D.     Liability of the City of Minneapolis**

The City of Minneapolis may be liable for Chief Jackson's actions if one of its customs or policies caused the violation of Kidd's First Amendment Rights. Davison, 490 F.3d at 659. To establish the City's liability, Kidd must present evidence of a policy, "officially adopted and promulgated by the City of Minneapolis, or a practice, so permanent and well-settled so as to constitute a custom, that existed and through which [the Chief] acted to" demote her. Id. The fact that the Chief had the authority to unappoint Deputy Chiefs, "in and of itself, does not rise to the level of a custom." Id. at 659 n.7. Kidd has not introduced any evidence, or indeed made any argument, regarding any City policy or practice that gave rise to the constitutional violation she alleges.

---

[4] Chief Jackson pled qualified immunity as an affirmative defense. Qualified immunity does not apply where, as here, Kidd has raised genuine questions of fact as to whether her rights were violated, and there is no doubt that her right as a public employee to speak on matters of public concern was clearly established at the time Chief Jackson demoted her. Pearson v. Callahan, 555 U.S. 223, 232 (2009).

The City may also be liable if an "'unconstitutional government policy could be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business.'"  Id. (quoting City of St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988)).  However, "'[t]he discretion to hire and fire does not necessarily include responsibility for establishing related policy.'"  Id. at 660 (quoting Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro, 64 F.3d 963, 966 (4th Cir. 1995)).  As here, Davison involved a firefighter complaining of the actions of the Chief of the Minneapolis Fire Department.  Id. at 654.  The Eighth Circuit studied the Minneapolis Charter and Code of Ordinances and concluded that the Minneapolis fire chief was not delegated final policymaking authority with respect to employment practices in the Fire Department.  Id. at 661.  Accordingly, the Chief's "final decision making authority regarding whom to [demote] in the Fire Department is insufficient to subject the City of Minneapolis to liability for his actions."  Id.

Kidd has not proffered any evidence that the Minneapolis Charter and Code of Ordinances have been amended to give the Chief such authority since the Eighth Circuit decided Davison in 2007.  Accordingly, the City of Minneapolis is not liable for Chief Jackson's actions, and must be dismissed from this lawsuit.  And because "an official-capacity suit is, in all respects other than name, to be treated as a suit against the [municipal] entity," Kentucky v. Graham, 473 U.S. 159, 166 (1985), Kidd's claims against Chief Jackson in his official capacity must likewise be dismissed.

III.   **ORDER**

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1.   Defendants' Motion for Summary Judgment [Doc. No. 21] is **GRANTED in part** and **DENIED in part**;

2.   Plaintiff's claims against the City of Minneapolis and Alex Jackson in his official capacity are **DISMISSED with prejudice**; and

3.   Counts Two, Three, and Four of the Complaint [Doc. No. 1] are **DISMISSED with prejudice**.

Dated:  August 14, 2012                      s/Susan Richard Nelson
                                             SUSAN RICHARD NELSON
                                             United States District Judge